UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| C. WESTBROOK MURPHY, *et al.*, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>PRICEWATERHOUSECOOPERS, )<br>LLP, )<br>)<br>Defendant. )<br>)<br>) | Civil Case No. 02-0982 (RJL) |

MEMORANDUM OPINION
(September 24, 2008)
[#185 (02-0982); #63 (05-1054)]

This case is before the Court on defendant's motion for summary judgment. Defendant PricewaterhouseCoopers, LLP ("PwC" or "defendant") moves for dismissal of Plaintiff C. Westbrook Murphy's ("Murphy" or "plaintiff") remaining age discrimination claims, brought under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01, *et seq.* Upon review of the pleadings, the entire record, and the applicable law, the Court GRANTS defendant's motion.[1]

---

[1] Defendant PwC filed identical motions for summary judgment in each of Plaintiff Murphy's pending related cases. (*See Murphy et al. v. PricewaterhouseCoopers*, Civil Action No. 02-982 (D.D.C.), Def.'s Mot. Summ. J. [Docket No. 185]; *Murphy v. PricewaterhouseCoopers*, Civil Action No. 05-1054 (D.D.C.), Def.'s Mot. Summ. J. [Docket No. 63].) These motions are addressed concurrently in this Memorandum Opinion. Unless otherwise specified, all citations herein to pleadings, exhibits, and other documents are to those appearing on the docket of Civil Action 02-982.

In addition, Defendant PwC filed a separate motion for the dismissal of Plaintiff Harold Schuler's remaining claims in Civil Action 02-982. (*See* Def.'s Mot. Summ. J. [Docket No. 187].) The Court will

# BACKGROUND

## I. Statutory Background

The Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*, makes it unlawful for an employer "to fail or refuse to hire or discharge any individual or otherwise discriminate against any individual [who is at least forty years old] with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); *see id.* § 631(a). Similarly, the District of Columbia Human Rights Act, D.C. Code § 2-1401.01, *et seq.*, provides in relevant part, that it shall be unlawful for any employer, "wholly or partially for a discriminatory reason based upon the actual or perceived: race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, family responsibilities, genetic information, disability, matriculation, or political affiliation of any individual . . . [t]o fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotion." D.C. Code. § 2-1402.11.

## II. Factual Background

### *A. The Parties*

PricewaterhouseCoopers, LLP is engaged in the business of providing professional services throughout the United States and the world. (Compl. ¶¶ 4, 5.) PwC is a limited

---

issue a separate decision on Defendant PwC's motion for summary judgment with respect to Plaintiff Schuler's remaining claims.

liability partnership, incorporated in Delaware and headquartered in New York. (*Id.*) PwC employs more than 20,000 individuals in the United States and has more than 2,000 individuals who are partners or principals. (Def.'s Stmt. [Docket No. 185-3] ¶ 2.)

Plaintiff C. Westbrook Murphy[2] has been an employee at PwC or its predecessor firm[3] since 1989. (Compl. ¶ 22.) Murphy is an attorney and, before joining PwC, held various positions at the U.S. Department of Justice, at the Office of the Controller of Currency, and in private practice. (*Id.* ¶ 21; Def.'s Mot. Summ. J., Murphy Tr. at 18.) PwC initially hired Murphy as a senior manager in the Regulatory Advisory Services ("RAS") unit in the firm's Washington, D.C. office.[4] (Compl. ¶¶ 13, 22.) Murphy was promoted to director in 1991 and to managing director in 2004. (Pl.'s Ex. 2 (Murphy Decl.) ¶¶ 7, 12, 30-31.) Murphy was not promoted to partner or principal during the course of his employment. (Compl. ¶ 27.) Murphy retired from PwC on March 1, 2006. (Murphy Decl. ¶ 1.)

### B. The PwC Partnership and Principals Agreement

PwC is organized and exists pursuant to the PwC Partnership and Principals Agreement ("the Partnership Agreement"), which provides that "[a]n Individual's association with the Firm shall cease at the end of the Fiscal Year in which he or she attains age 60." (Def.'s Stmt. ¶ 2; Pl.'s Ex. 4, Art. 10, Sec. 10.1(a).) The term

---

[2] Murphy, born in 1940, was sixty-two years of age at the time his original action was brought. (Compl. ¶ 11.)

[3] PwC was formed effective July 1, 1998 through a merger of Price Waterhouse LLP and Coopers & Lybrand LLP, each of which were governed by written partnership agreements. (Def.'s Stmt. ¶ 2.)

[4] The RAS unit provides advice to banks and thrifts in areas of regulatory concern. (Def.'s Ex. D.) RAS is a relatively small consulting group within PwC's Banking practice, which is part of the Financial Services practice within the firm's Audit and Business Advisory Service. (Def.'s Stmt. ¶ 3.)

"Individual" is defined as "a person who is either a Partner or a Principal." (Pl.'s Ex. 4, Art. 1.) The sole parties to the Partnership Agreement are the partners and principals of PwC. There is no such mandatory retirement provision for PwC employees. (Def.'s Mot. Summ. J., Carter Tr. at 222.)

### C.   *2000, 2001, and 2004 Partnership Promotion Cycles in the RAS Unit*

PwC has an annual partnership selection process, culminating each year in the announcement of new partners effective July 1 (the beginning of PwC's fiscal year). (Def.'s Stmt. ¶ 4.) The admission process begins in the preceding fiscal year, with the partners in each business unit of the firm identifying potential partner candidates. (Carter Tr. at 96.) During the relevant time period, Robert Bench ("Bench"), as managing partner of the RAS unit, had primary responsibility for hirings and promotions within the RAS unit.[5] (Def.'s Mot. Summ. J., Schuler Tr. at 23-24; Def.'s Mot. Summ. J., Murphy Tr. at 894-95.) When identifying potential partnership candidates, Bench, together with other RAS partners, considered the RAS unit's business need for new partners and, assuming there was such a need, determined which of the RAS employees was best qualified to meet this need. (Def.'s Mot. Summ. J., Bench 11/29/2006 Tr. at 50-52; Def.'s Mot. Summ. J., Lewis Tr. at 155-59.)

Murphy was never identified as a possible partner candidate during the relevant years in question (2000, 2001, or 2004). (Def.'s Stmt. ¶ 12.) Instead, David Albright,

---

[5]   Bench retired on June 30, 2003, and William Lewis succeeded as managing partner of the RAS unit. (Def.'s Mot. Summ. J., Lewis Tr. at 41-42.) Upon Bench's retirement on June 30, 2003, the partnership consideration process for employees in RAS was initiated by the four remaining partners in RAS. (Def.'s Mot. Summ. J., Murphy Tr. at 895-96.)

one of Murphy's colleagues in the RAS unit, was sponsored and admitted in the 2000 partner admission cycle. (*Id.* ¶ 13.) No RAS unit employees were proposed or admitted during the 2001 or 2002 cycles. (*Id.*) Another colleague, Jeff Lavine, was proposed in the 2003 and 2004 cycles and admitted in the 2004 cycle. (*Id.*; *see also* Def.'s Ex. G; Bench 11/29/2006 Tr. at 175-76.)

### III. Procedural Background

Plaintiff Murphy filed an administrative charge with the District of Columbia Office of Human Rights ("DCOHR") on March 14, 2001, delivering a copy of the charge to his supervisor the same day. (Compl. ¶ 32.) Plaintiff Murphy, along with Plaintiff Harold Schuler ("Schuler"), filed suit on May 20, 2002, alleging violations of the ADEA, DCHRA, and the Human Rights Law of New York ("NYHRL"), Executive Law Article 15, *et seq.* (*Id.* ¶¶ 42-51.) Specifically, Murphy alleges that PwC denied him promotion to partnership in 1999, 2000, and 2001 and instead promoted younger, less experienced employees. (*Id.* ¶ 29.) Murphy sought to proceed on a "pattern or practice" theory on behalf of a class of purportedly similarly situated "older" employees of the firm. (*See* Compl.) On September 27, 2004, I issued a ruling on cross-motions for partial summary judgment and defendant's motion to dismiss, significantly narrowing plaintiff's claims. *See Murphy v. PricewaterhouseCoopers, LLP*, 357 F. Supp. 2d 230 (D.D.C. 2004). As a result of this decision, the only remaining claims in Murphy's 2002 action (Civil Action No. 02-982) are his individual disparate treatment claims against PwC for non-promotion in the firm's July 1, 2000 and July 1, 2001 partner admission cycles under the ADEA and

DCHRA.[6] *Id.* at 244. Murphy commenced a second, separate action against PwC in June 2005 (Civil Action No. 05-1054) for his non-promotion to partner during the July 1, 2004 cycle, alleging violations of the ADEA and DCHRA. Murphy's 2004 claim has been pursued only as an individual action. (*See* Pl.'s Opp'n at 3 ("The failure to promote Murphy in 2004 is the subject of No. 05-1054.").)

Defendant PwC now moves for summary judgment on Murphy's remaining disparate treatment claims.[7] PwC argues that Murphy has not produced sufficient evidence for a reasonable jury to find that PwC intentionally discriminated against Murphy on the basis of his age. For the following reasons, the Court agrees.

## LEGAL STANDARDS

### I. Legal Standard for Summary Judgment

Under Rule 56, summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine issue as to any material fact and that the

---

[6] In precluding both parties' cross-motions for summary judgment on these remaining claims, the Court found that "the record is, as of yet, not fully developed regarding the particular circumstances under which the two plaintiffs were not advanced to partnership" and as a result there were genuine issues of material fact relating to the "disparate treatment" theory. *Murphy*, 357 F. Supp. 2d at 249. Fact discovery was then reopened by Order of the Magistrate Judge entered May 22, 2006, permitting inquiry into "the reasons for Schuler and Murphy's non-promotion to partnership" (Docket No. 143 at 6-7), which concluded in February 2007.

[7] Through invocation of the "law of the case" doctrine, plaintiff attempts to foreclose several arguments currently advanced by PwC, which were it raised in a prior motion for summary judgment that was summarily denied without opinion by the Court (*see* Order entered August 30, 2005 [Docket No. 128]). (*See* Pl.'s Opp'n at 37-41.) This argument is without merit. The law of the case doctrine embodies "the general concept that a court involved in later phases of a lawsuit should not re-open questions decided (*i.e.*, established as the law of the case) by that court or a higher one in earlier phases." *Crocker v. Piedmont Aviation*, 49 F.3d 735, 739 (D.C. Cir. 1995). This doctrine, however, is prudential, not jurisdictional. *See id.* at 739-40. Moreover, because the arguments presented in PwC's current motion for summary judgment are based, at least in part, on an expanded record, Schuler's law of the case argument fails. *See Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 251 (D.C. Cir. 1987) ("A subsequent motion for summary judgment based on an expanded record is always permissible.").

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment may support its motion by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). In opposing summary judgment, the "nonmoving party [must] go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact, *id.* at 323, and the Court draws all reasonable inferences regarding the assertions made in a light favorable to the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## II. Legal Standard for ADEA and DCHRA Disparate Treatment Claims

Under a "disparate treatment" theory of liability of age discrimination, a plaintiff must demonstrate that his employer intentionally treated him less favorably *because of* his age.[8] *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609-10 (1993). Where direct

---

[8] In applying the provisions of the ADEA and DCHRA, courts in this district have drawn on Supreme Court precedent regarding race and gender discrimination under Title VII of the Civil Rights Act of 1964. *See Carpenter v. Fed. Nat'l Mortg. Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999); *Arnold v. U.S. Postal Service*, 863 F.2d 994, 996 (D.C. Cir. 1988); *Mianegaz v. Hyatt Corp.*, 319 F. Supp. 2d 13, 18 (D.D.C. 2004); *see also Futrell v. Dep't of Labor Federal Credit Union*, 816 A.2d 793, 802 (D.C. 2003). Courts thus apply the *McDonnell Douglas* burden-shifting framework developed in the context of Title VII claims in evaluating age discrimination claims at the summary judgment phase. *Mianegaz*, 319 F. Supp. 2d at 18 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)). Because the Court applies the same analysis to Murphy's ADEA and DCHRA claims, the Court refers from this point

evidence of discriminatory intent is not available, courts have traditionally applied the familiar burden-shifting scheme first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973): (1) the plaintiff has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination; (2) the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its actions; and (3) the plaintiff must then prove by a preponderance of the evidence that the employer's stated reasons were in reality a pretext for discrimination.[9] *See Stella v. Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002) (citing, among other authorities, *McDonnell Douglas*, 411 U.S. at 802-04).

The D.C. Circuit has recently clarified the *McDonnell Douglas* analysis "where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision."[10] *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). In such cases, a court need not – *and should not* – determine whether the plaintiff has produced sufficient evidence to support an inference of discrimination. *Id.* Instead, it should proceed directly to the third step of the *McDonnell Douglas* framework and determine whether "the employee produced

---

on to Murphy's claims under the ADEA only.

[9] Plaintiff seeks to proceed both under the traditional pretext analysis and under a mixed-motive analysis. (*See* Pl.'s Opp'n at 33-36.) Because Murphy has not shown that age was a factor, let alone a "substantial motivating factor," in PwC's non-promotions decisions, there is no basis upon which Murphy may proceed on a "mixed motive" theory. *See Thomas v. Nat'l Football League Players Ass'n*, 131 F.3d 198, 202 (D.C. Cir. 1997) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 276 (1989)).

[10] Although *Brady* was decided in the context of a Title VII race claim, the analysis is also applicable to ADEA disparate treatment claims. *See, e.g., Beard v. Preston*, 2008 WL 4273122, at *6 (D.D.C. Sept. 18, 2008) (applying *Brady* to an ADEA claim); *Brantley v. Kempthorne*, 2008 WL 2073913, at *3 (D.D.C. May 13, 2008) (same); *Short v. Chertoff*, 555 F. Supp. 2d 166, 172 (D.D.C. 2008) (same).

8

sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin." *Id.* (citations omitted). Murphy failed to do so here. How so?

## ANALYSIS

Before deciding the ultimate issue under *Brady*, the Court must first find that plaintiff has alleged an adverse employment action and defendant has proffered a legitimate, non-discriminatory rationale for the alleged discriminatory action. In this case, Murphy has alleged three adverse employment actions – his non-promotion during the 2000 partner admission cycle, his non-promotion during the 2001 cycle, and his non-promotion during the 2004 cycle.[11] *See Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir.

---

[11] PwC contends that these failures to promote do not amount to adverse employment actions. Specifically, PwC alleges that, due to the application of the Partnership Agreement, Murphy would have only been able to take advantage of the benefits of partnership for a limited time and would have lost "substantial [retirement and retiree health care] benefits" he now receives as a retired employee of PwC. (Def.'s Mot. Summ. J. at 3, 25-28). This argument, however, fails to recognize the corresponding non-monetary benefits Murphy was denied because of his non-promotions. *See Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation"). In *Stewart v. Ashcroft*, 352 F.3d 422 (D.C. Cir. 2003), the D.C. Circuit held that a failure to advance plaintiff within the hierarchy of his department amounted to an adverse employment action, irregardless of the fact that there was no change in pay, benefits, or other material consequences. *Id.* at 426-27. In finding that there was an adverse employment action, the Court of Appeals emphasized the potential future employment opportunities and increased supervisory authority in attaining such a prestigious position. *Id.*; *see also Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999) (requiring that an adverse employment action have "materially adverse consequences affecting the terms, conditions, or privileges of [plaintiff's] employment or *[plaintiff's] future employment* opportunities such that a reasonable trier of fact could conclude that [he] has suffered objectively tangible harm") (emphasis added). The benefits of attaining the title of "partner" at PwC, in terms of increased status and the potential future employment opportunities that such a title may present, are evident. Given the advantages of even a short tenure as a partner at PwC, a reasonable trier of fact could conclude that Murphy's non-promotions amounted to an objectively tangible harm. The Court therefore finds that Murphy has sufficiently alleged three discrete adverse employment actions.

9

2003) (defining an adverse employment action as "a significant change in employment status, such as hiring, firing, *failing to promote*, reassignment with significantly different responsibilities, or a decision causing significant change in benefits") (internal citations omitted, emphasis added). Additionally, PwC proffers several legitimate, non-discriminatory explanations for Murphy's non-promotions. First, PwC contends that it never even *considered* Murphy as a possible partner candidate because he did not have the required minimum performance evaluation ratings.[12] (Def.'s Mot. Summ. J. at 21-22.) Second, PwC alleges that it did not believe Murphy had a genuine interest in becoming partner.[13] (*Id.*)

Consequently, the sole remaining question under *Brady* is whether plaintiff has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee." *Brady*, 520 F.3d at 494. In making this determination on pretext, a court must consider whether the jury could infer discrimination from (1) the plaintiff's *prima facie* case, (2) any evidence the plaintiff

---

[12] PwC maintains that only those employees who had "sustained outstanding performance over time" reflected in "1" rated annual performance evaluations were considered as potential partner candidates in the RAS unit. (Def.'s Stmt. ¶ 8.) Performance is rated on a scale of "1" to "4," with "1" being the highest. (Def.'s Mot. Summ. J. at 2, n.2.) The ratings reflect an employee's performance relative to others in his peer group (Pl.'s Ex. 39) and are based on a fairly extensive annual performance evaluation process undertaken by an annual review committee. (Def.'s Stmt. ¶ 9; Pl.'s Ex. 39.) The process results in a detailed written performance evaluation, signed by both the reviewing partner and the employee, and a statement regarding the employee's potential for promotion. (Def.'s Stmt. ¶ 9.)

[13] Our circuit court has accepted such explanations as legitimate and non-discriminatory. *See, e.g., Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1182, 1184 (D.C. Cir. 1996) (basing selection of applicants solely on interview score was legitimate, non-discriminatory rationale); *Morgan v. Fed'l Home Loan Mortg. Corp.*, 328 F.3d 647, 654 (D.C. Cir. 2003) (good faith belief that plaintiff was not interested in position was legitimate, non-discriminatory rationale).

presents to attack the employer's proffered explanation, and (3) any further evidence of discrimination that may be available to the plaintiff. *Waterhouse v. District of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998)). "The plaintiff need not present evidence in each of these categories in order to avoid summary judgment. Rather, the court should assess the plaintiff's challenge to the employer's explanation in light of the total circumstances of the case." *Short v. Chertoff*, 555 F. Supp. 2d 166, 172 (D.D.C. 2008) (citations omitted).

In this case, Murphy attempts to directly challenge PwC's proffered explanations and to bolster his claim of intentional discrimination with additional evidence. He, however, has failed to rebut PwC's legitimate, non-discriminatory explanations and has not presented sufficient evidence to support a finding by a reasonable jury of intentional discrimination based on age. *See Holcomb v. Powell*, 433 F.3d 889, 901 (D.C. Cir. 2006).

## I. Evidence Rebutting PwC's Legitimate Non-Discriminatory Explanations

### A. *Murphy's Lack of Absolute Qualifications*

To rebut PwC's explanation that Murphy did not meet the RAS unit's minimum requirements for partner (*i.e.*, being a sustained "1" rated performer), Murphy does not present evidence that he in fact was a "1" rated performer.[14] Instead, he alleges that RAS had no such requirement for partnership candidates. (Pl.'s Opp'n at 26.) To support this

---

[14] Murphy received only one "1" rating between the years of 1997 and 2003. (Def.'s Exs. J, K, L, M.) During the relevant time period, Murphy received the following annual performance ratings: "2" for 1997, "2" for 1998, "1" for 1999, "3" for 2001, "3" for 2002, and "2" for 2003. (*Id.*) There is no documentation of Murphy's 2000 rating in the record. (Def.'s Mot. Summ. J. at 9.)

claim, Murphy points to an informational guide for the Banking, Financial Services and Assurance practice groups as purportedly setting out a lower standard for promotion. (Pl.'s Opp'n at 26-27.) This, however, proves little. That these practice groups may have had lower minimum standards for promotion in certain instances does not mean that the RAS unit follows such standards or that such standards are even relevant to the analysis here. *See Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997) (finding the partnership admission procedures in department other than plaintiff's to be irrelevant); *see also Fischbach*, 86 F.3d at 1183 (department's failure to follow written regulations in selection process was not sufficient to support finding of pretext).

In fact, Murphy has presented no evidence to rebut PwC's contention that the RAS unit, to which Murphy belonged, in fact required a higher standard for partnership promotion. Murphy does not dispute that the partnership consideration process for RAS employees began within the RAS unit, at the recommendation of Bench and later Lewis. (*See* Def.'s Stmt ¶¶ 5-7.) Nor does he rebut Bench's and Lewis' testimony that the RAS unit considered only "1" rated performers as potential partnership candidates. (*See* Bench 11/26/2006 Tr. at 170-71, 185-86; Lewis Tr. at 175-76, 178-79.) Moreover, Bench and Lewis's testimony is corroborated by the fact that, during the relevant time period, only those employees who were sustained "1" rated performers were proposed as partnership candidates from RAS.[15] Simply put, Murphy does little to rebut PwC's proffered explanation that he was denied partnership because of his lack of qualifications.

---

[15] All of the RAS employees sponsored as candidates for partner from 1998 to 2003 were sustained "1" rated performers. Harold Schuler was proposed for admission in the 1999 cycle, David Albright was

### B. *Murphy's Lack of Interest*

Additionally, Murphy has presented no evidence to rebut PwC's contention that it did not believe Murphy was genuinely interested in making partner.[16] *See Morgan*, 328 F.3d at 654 (finding that plaintiff failed to meet his burden of showing discriminatory intent where he offered no evidence to rebut defendant's contention that it was unaware of plaintiff's continued interest in a directorship position). To the contrary, the record demonstrates that Murphy's conduct was inconsistent with his purported desire to be promoted to partner. Specifically, Murphy voluntarily relinquished all of his managerial responsibilities as director for an indefinite period beginning in December 1999, (Murphy Tr. at 169-70, 731, 707-09); expressed an interest in obtaining an early retirement or working on a part-time basis in 2000, (*id.* at 135-47); and only articulated his interest in partnership consideration when his request for early retirement was rejected in March 2001, (*id.* at 418).[17] Given all this, PwC's belief that Murphy was not genuinely interested in making partner certainly seems reasonable and Murphy has provided no

---

proposed and admitted in the 2000 cycle, no RAS unit employee was proposed in the 2001 or 2002 cycles, and Jeffrey Lavine was proposed in the 2003 and 2004 cycles (and admitted in the latter cycle). (Def.'s Exs. F, G, H.) Schuler, Albright, and Lavine had received "1" ratings in the three years preceding their partnership proposals. (*Id.*) Although plaintiff alleges that Albright's performance evaluation for 1997 did not reflect a "1" rating, (Pl.'s Stmt. ¶ 5), this does not appear to be true from the record, (*see* Def.'s Ex. T). Plaintiff's mere allegations, without more, are insufficient to create a genuine issue of material fact. *See* Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Anderson*, 477 U.S. at 249-50.

[16]  Plaintiff simply argues in his Statement of Facts that "PwC partners earned on average nearly three times what Murphy made as a Director, and a factfinder could conclude that this made partnership attractive to plaintiff." (Pl.'s Stmt. [Docket No. 202] at 4.)

[17]  In 2000, Murphy inquired about the possibility of cutting an early retirement deal or working on a part-time basis. (Murphy Tr. at 145-46.) Murphy was informed that he would not be eligible to receive retiree health benefits until his normal retirement date at age 65. (Def.'s Ex. O.) Several days later, Murphy informed Bench that he had filed a discrimination charge with the DCOHR and that he wanted to be considered for promotion to partner at age 62. (Murphy Tr. at 175-76; Def.'s Ex. P.)

evidence to the contrary. *See Woodruff v. Peters*, 482 F.3d 521, 531 (D.C. Cir. 2007) ("We review not 'the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers.'") (quoting *Fischbach*, 86 F.3d at 1183).

## II. Other Evidence of Discrimination

Murphy is not limited to directly challenging PwC's proffered rationales. He can also "avoid summary judgment by presenting other evidence, direct or circumstantial, that permits an inference of discrimination." *Holcomb*, 433 F.3d at 899.

### A. Relative Qualifications

Murphy attempts to prove discriminatory motive by demonstrating that he was more qualified for promotion to partnership than Albright (promoted in 2000) or Lavine (promoted in 2004).[18] In *Holcomb*, our circuit court "concluded a factfinder could infer discrimination if the evidence showed a reasonable employer would have found the plaintiff *significantly* better qualified for the job but nevertheless failed to offer the position to her." *Holcomb*, 433 F.3d at 897 (citing *Aka*, 156 F.3d at 1295). The theory is that "if the employer made an error [in judging the plaintiff's qualifications] too obvious to be unintentional, perhaps it had an unlawful motive for doing so." *Fischbach*, 86 F.3d at 1183; *see also Holcomb*, 433 F.3d at 897 ("In order to justify an inference of discrimination, the qualifications gap must be great enough to be inherently indicative of discrimination.") (citing *Lathram v. Snow*, 336 F.3d 1085, 1091 (D.C. Cir. 2003)). "Short

---

[18] Because no employee from the RAS unit was proposed or promoted to partner in 2001, Murphy does not provide a comparative-qualifications analysis with respect to this promotion year.

of finding that the employer's stated reason was indeed a pretext, however--and here one must beware of using 20/20 hindsight--the court must respect the employer's unfettered discretion to choose among qualified candidates."[19] *Fischbach*, 86 F.3d at 1183 (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986) (warning that district judge does not sit as a "super-personnel department that reexamines an entity's business decisions")).

In support of his contention that he is significantly better qualified than Albright or Lavine, Murphy provides a lengthy analysis of his own purported qualifications for partner and gives his personal views on the relative qualifications of Albright and Lavine. (Pl.'s Opp'n at 9-25.) Murphy's submission, however, does not support a finding that the "qualifications gap" between himself and Albright, or Lavine, was so great as to show pretext. To the contrary, both Albright and Lavine received exceptional annual performance ratings in the years leading to their partnership proposals. (Def.'s Exs. F, G, H.) Murphy, on the other hand, received mediocre marks in those years.[20] (Def.'s Exs. J, K, L, M.) Since these performance ratings were assigned based on each employee's relative standing within his/her peer group, it makes perfect sense that the top-rated

---

[19] "In a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call." *Holcomb*, 433 F.3d at 897 (quoting *Aka*, 156 F.3d at 1294).

[20] Notably Murphy does not dispute that he was not a sustained "1" rated performer. (*See* Pl.'s Stmt. at 10.) Instead, he contends that he received lower annual ratings than he deserved. Murphy asserts, *without providing evidentiary support*, that his overall annual ratings should have been "close[ly] correlate[ed]" to the ratings he received on individual engagements, which were generally higher than his annual ratings. (Pl.'s Opp'n at 27-28.) In reality, the annual ratings were based on an employee's performance relative to others in his peer group. (Pl.'s Ex. 39).

Murphy additionally contends that his low ratings in 2002 and 2003 are best explained by "retaliation" for filing his March 2001 administrative complaint. (Pl.'s Opp'n at 27-29.) This contention cannot be taken seriously as Murphy provides no support for it in the record.

employees (in this case, Albright and Lavine) would be proposed as partnership candidates. (*See* Pl.'s Ex. 39, at PwC 01147.) Moreover, Albright and Lavine's exceptional performance ratings were justified by their broad subject matter expertise, which allowed them to "win and lead significant engagements," (Lewis Tr. at 104), and their high levels of chargeable time, (Bench 11/29/2006 Tr. at 118, 160-66). In contrast, Murphy "was often not productively . . . engaged" and "needed someone to provide him with work." (Lewis Tr. at 90-92; *see also id.* at 176-81 (noting that Murphy had 1,100 hours of unchargeable time in one year); Murphy Tr. at 673-76 (same).)

Based on the record presented to the Court, Murphy has not produced sufficient evidence for a jury to conclude that a reasonable employer would have found him significantly better qualified for partner than either Albright or Lavine. Murphy simply has not shown that the "qualifications gap" was "great enough to be inherently indicative of discrimination." *Holcomb*, 433 F.3d at 897.

### B. Partner Retirement Provision

Finally, Murphy alleges that he faced a "no-partner-over-60-rule" and that PwC has a blanket policy against considering individuals over a certain age for partner. (*See* Pl.'s Opp'n at 7.) Plaintiff, however, has provided insufficient proof that such a policy exists[21] and instead relies heavily on the mandatory retirement provision in the

---

[21] As proof of PwC's discriminatory policy, Murphy points to several stray comments. Documented only by "memos to the file" authored by Murphy himself, plaintiff recites (1) a comment made by Tim Ryan (managing partner of the Banking practice group) about PwC's desire to have their partners serve for 20 or more years, and (2) a statement by Paul Sullivan (a member of PwC's governing Policy Board), who allegedly stated that employees over 60 are not considered for partner. (Pl.'s Opp'n at 8-9; Pl.'s Exs. 7, 8.) Murphy provides no support to show that Ryan or Sullivan's statements were widely held policies. To the contrary, PwC has proffered the deposition testimony of numerous PwC

Partnership Agreement as proof of PwC's discriminatory motive. (*Id.*) This reliance, however, is misplaced. The Partnership Agreement is not a policy barring older candidates from partnership, but instead is an agreement among the partners at PwC, requiring only those individuals subject to the agreement to retire in the fiscal year in which they turn 60. (Pl.'s Ex. 4.) It is binding only on the partners and principals of the firm and no similar retirement provisions exist for employees.[22] (*Id.*) As the Court previously noted, because the Partnership Agreement "neither addresses nor binds the plaintiffs in any way," it "cannot form the sole basis of a 'disparate treatment' theory."[23] *Murphy*, 357 F. Supp. 2d at 249.

## CONCLUSION

Considering the entire record, the strength of PwC's legitimate, non-discriminatory rationale, and the evidence relating to pretext, the Court finds that a

---

partners, including Ryan and Sullivan, who have testified that there are such no-age based policies. (*See* Def.'s Mot. Summ. J., Nally Tr. at 121-22; Def.'s Mot. Summ. J., Sullivan Tr. at 244-46; Carter Tr. at 113-14; Def.'s Mot. Summ. J., Ryan Tr. at 248; Bench 11/29/06 Tr. at 171-72; Lewis Tr. at 189-90, 193; Def.'s Mot. Summ. J., Albright Tr. at 281.)

  Moreover, these comments simply do not support a finding of pretext or discriminatory intent. Stray comments, such as these, "by persons not involved in the employment decision-making process are not material to a finding of discrimination unless those remarks are made to the decision-makers and have some impact on the selection process." *Garrett v. Lujan*, 799 F. Supp. 198, 200 (D.D.C. 1992); *see also Threadgill v. Spellings*, 377 F. Supp. 2d 158, 164 (D.D.C. 2005). Murphy has provided no evidence showing that Ryan or Sullivan had any direct involvement in the decision-making process for Murphy's partnership prospects. Consequently, these comments cannot support an inference of intentional age discrimination.

[22]   Contrary to plaintiff's suggestion, whether a partner at PwC could theoretically invoke the ADEA's protection under the framework set out in *Clackamas Gastroenterology Associates, P.C. v. Wells*, 538 U.S. 440, 444 (2003), is not relevant to the ultimate issue presented here – that is, whether PwC intentionally discriminated against Schuler on the basis of his age – and is therefore outside the scope of this Opinion.

[23]   Now that the record has been fully developed, Murphy's continued reliance on the Partnership Agreement as evidence of discriminatory intent is insufficient without more to carry his burden of proof.

reasonable jury could *not* conclude from all of the evidence that Murphy's non-promotions in 2000, 2001, and 2004 were made for a discriminatory reason. Murphy has not provided evidence sufficient to rebut PwC's legitimate, non-discriminatory explanations for his non-promotions and has not met his burden in proving discriminatory intent.

Accordingly, the Court GRANTS defendant's Motion for Summary Judgment. An appropriate Order consistent with this ruling accompanies this Opinion.

_____
RICHARD J. LEON
United States District Judge