## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| C. WESTBROOK MURPHY, and HAROLD SCHULER, | ) ) ) |
| Plaintiffs, | ) ) |
| | ) **Civil Case No.  02-982 (RJL)** |
| v. | ) ) |
| PRICEWATERHOUSECOOPERS, LLP, | ) ) ) |
| Defendant. | ) ) |

### MEMORANDUM OPINION
(September **2 4** 2008) [#187]

This case is before the Court on defendant's motion for summary judgment.

Defendant PricewaterhouseCoopers, LLP ("PwC" or "defendant") moves for dismissal of

Plaintiff Harold Schuler's ("Schuler" or "plaintiff") remaining age discrimination claims,

brought under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et*

*seq.*, and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-

1401.01, *et seq.*  Upon review of the pleadings, the entire record, and the applicable law,

the Court GRANTS defendant's motion.[1]

---

[1]     Defendant PwC filed a separate motion for the dismissal of Plaintiff C. Westbrook Murphy's
remaining claims in this action. (*See* Def.'s Mot. Summ. J. [Docket No. 185].)  The Court will issue a
separate decision on Defendant PwC's motion for summary judgment with respect to Plaintiff Murphy's
remaining claims.

# BACKGROUND

## I. Statutory Background

The Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*, makes it unlawful for an employer "to fail or refuse to hire or discharge any individual or otherwise discriminate against any individual [who is at least forty years old] with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); *see id.* § 631(a).  Similarly, the District of Columbia Human Rights Act, D.C. Code § 2-1401.01, *et seq.*, provides in relevant part, that it shall be unlawful for any employer, "wholly or partially for a discriminatory reason based upon the actual or perceived: race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, family responsibilities, genetic information, disability, matriculation, or political affiliation of any individual . . . [t]o fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotion." D.C. Code. § 2-1402.11.

## II. Factual Background

### A. The Parties

PricewaterhouseCoopers, LLP is engaged in the business of providing professional services throughout the United States and the world.  (Compl. ¶¶ 4, 5.)  PwC is a limited liability partnership, incorporated in Delaware and headquartered in New York.  (*Id.*)  PwC employs more than 20,000 individuals in the United States and has more than 2,000

individuals who are partners or principals.  (Pl.'s Opp'n [Docket No. 204] at 3; Def.'s

Stmt. [Docket No. 187-3] ¶ 2.)

Plaintiff Harold Schuler[2] has been an employee at PwC or one of its predecessor

firms[3] since 1988.  (Compl. ¶ 12.)  Before joining PwC, Schuler held various positions at

the Office of the Controller of Currency.  (*Id.* ¶ 24.)  PwC initially hired Schuler as a

senior manager in the Regulatory Advisory Services ("RAS") unit in the firm's

Washington, D.C. office.[4]  (*Id.* ¶ 12.)  Shortly after joining PwC, Schuler was promoted

to director and was later promoted to managing director in the RAS unit.  (*Id.*)  Schuler

was not promoted to partner or principal during the course of his employment.  (*Id.* ¶ 27.)

### B.  *The PwC Partnership and Principals Agreement*

PwC is organized and exists pursuant to the PwC Partnership and Principals

Agreement ("the Partnership Agreement"), which provides that "[a]n Individual's

association with the Firm shall cease at the end of the Fiscal Year in which he or she

attains age 60."  (Def.'s Stmt. ¶ 2; Pl.'s Ex. 1, Art. 10, Sec. 10.1(a).)  The term

"Individual" is defined as "a person who is either a Partner or a Principal."  (Pl.'s Ex. 1,

Art. 1.)  The sole parties to the Partnership Agreement are the partners and principals of

---

[2]     Schuler, born on October 21, 1944, was fifty-seven years of age at the time this action was brought.  (Compl. ¶ 11.)

[3]     PwC was formed effective July 1, 1998 through a merger of Price Waterhouse LLP and Coopers & Lybrand LLP, each of which were governed by written partnership agreements.  (Def.'s Stmt. ¶ 2.)

[4]     The RAS unit provides advice to banks and thrifts in areas of regulatory concern.  (Def.'s Ex. B.) RAS is a relatively small consulting group within PwC's Banking practice, which is part of the Financial Services practice within the firm's Audit and Business Advisory Service.  (Def.'s Stmt. ¶ 3.)  At the time of the commencement of this action, RAS was comprised of more than twenty professionals, (Compl. ¶ 26), five of whom were partners, (Def.'s Ex. C; Def.'s Mot. Summ. J., Bench Tr. at 26-30).  Partners in the RAS unit who are not certified public accountants are known as "principals" of the firm.  (Def.'s Mot. Summ. J., Murphy Tr. at 174-75.)  All references herein to "partners" are deemed to include "principals."

PwC.  There is no such mandatory retirement provision for PwC employees.  (Def.'s

Stmt. ¶ 19.)

### C. 1999, 2000, 2001 Partnership Promotion Cycles in the RAS Unit

PwC has an annual partnership selection process, culminating each year in the

announcement of new partners effective July 1 (the beginning of PwC's fiscal year).

(Def.'s Ex. Q, ¶ 1.)  The admission process begins in the preceding fiscal year, with

partners in each business unit of the firm identifying potential partner candidates.  (Def.'s

Mot. Summ. J., Carter Tr. at 96.)  During the relevant time period, Robert Bench

("Bench"), as managing partner of the RAS unit, had primary responsibility for hirings

and promotions within the RAS unit.  (Def.'s Mot. Summ. J., Schuler Tr. at 23-24; Def.'s

Mot. Summ. J., Murphy Tr. at 894-95.)  When identifying potential partnership

candidates, Bench, together with other RAS partners, considered the RAS unit's business

need for new partners and, assuming there was such a need, determined which of the

RAS employees was best qualified to meet this need.  (Def.'s Mot. Summ. J., Bench

11/29/2006 Tr. at 50-52; Def.'s Mot. Summ. J., Lewis Tr. at 155-59.)  Only those

employees who had "sustained outstanding performance over time" reflected in "1" rated

annual performance evaluations[5] were considered as potential partner candidates in the

RAS unit.[6]  (Bench 11/29/2006 Tr. at 170-71.)

---

[5]     Performance is rated on a scale of "1" to "4," with "1" being the highest.  (Def.'s Mot. Summ. J. at n.7, 11.)

[6]     Once a partner candidate is identified in a business unit, the sponsoring partner completes a proposal form for that candidate.  (Carter Tr. at 96.)  The views of all partners are then solicited for each proposed candidate through a "soundings" process.  (*Id.*; Lewis Tr. at 163-64.)  Those candidates who receive sufficient support in the "soundings" process advance to the next step in the partner admissions process.  (Def.'s Stmt. ¶ 10.)

In June 1998, Bench identified Schuler as a potential partner candidate from the RAS unit and prepared a Partner Candidate Proposal for Schuler's admission in the 1999 cycle.[7] (Def.'s Ex. J.) Schuler, however, did not receive adequate support in the "soundings" process (a canvass of the partners to gauge support in the firm for the proposed candidacy) to proceed to the formal partnership process.[8] (Def.'s Mot. Summ. J., Bench Tr. at 118, 121, 143.) Although Bench agreed to support Schuler again in the 2000 admission cycle, Schuler's proposed candidacy was not put through another round of soundings.[9] (Def.'s Ex. O; Schuler Tr. at 29-31.) Another RAS unit employee, David Albright ("Albright"), was proposed and admitted in the 2000 partnership cycle. (Bench 11/29/2006 Tr. at 185-86.) A firm-wide announcement, listing Albright (and others) as newly admitted partners, was made on June 2, 2000.[10] (Def.'s Ex. H.) No RAS employees, including Schuler, were sponsored as potential partner candidates in the 2001 cycle and no new partners were admitted from the RAS unit until July 1, 2004.

---

[7]    The proposal noted that Schuler was a "sustained exceptional performer" and set out Schuler's performance ratings for 1997, 1998, and 1999, all of which were "1" ratings. (Def.'s Ex. J at PwC 03241-42.)

[8]    For a candidate to advance to the next step in the partner admission process, a canvass for soundings typically results in 20 to 30 responses. (Def.'s Mot. Summ. J., Moritz Tr. at 66-69.) Schuler's canvass only resulted in 12 responses, including six "Yes," two "No," and four indicating "Insufficient" familiarity with Schuler to respond. (Def.'s Ex. K.)

[9]    Christopher Lucas (head of the Banking practice) advised Bench that the initiation of another soundings process on Schuler's behalf was not warranted because there had not been a significant change in circumstances or views since the 1999 soundings process, which resulted in insufficient support for Schuler. (Def.'s Mot. Summ. J., Lucas Decl. ¶ 4.)

[10]   Schuler testified that he knew about Albright's promotion before this formal announcement. (Def.'s Mot. Summ. J., Schuler 2/7/2007 Tr. at 164-69.)

## III.  Procedural Background

### A.  Administrative Complaint

Plaintiff Schuler filed an administrative charge with the District of Columbia

Office of Human Rights ("DCOHR") on or about June 29, 2001.  (Compl. ¶ 32.)[11]  This

complaint was cross-filed with the U.S. Equal Employment Opportunity Commission

("EEOC").  (*Id.*)  The charge states that PwC has denied Schuler "promotional

opportunities" on the basis of his age because the Partnership Agreement requires

partners and principals to retire at 60, and as a result, "no professional employee who is

60 years old or older can be promoted to partnership."  (*See* Def.'s Mot. to Dismiss

[Docket No. 30], Ex. E ("Schuler Discrimination Compl.") at 1.)[12]  Schuler's charge

alleges that, although he is qualified for partnership, he has not been promoted to partner.

(*Id.* at 1-2.)  The charge also references the partnership promotion of younger, less

qualified employees in 2000.  (*Id.* at 2.)  Schuler subsequently amended his original

charge on December 12, 2001 to allege that PwC refused to consider him for promotion

to partner in 1999, 2000, and 2001.  (*See* Def.'s Mot. to Dismiss [Docket No. 30], Ex.

G.)[13]

### B.  Schuler's Remaining Claims

Plaintiff Schuler, along with Plaintiff C. Westbrook Murphy ("Murphy"), filed this

---

[11]     Schuler's June 29, 2001 charge was attached as an exhibit to a motion to dismiss, filed by PwC on August 16, 2002.  (*See* Def.'s Mot. to Dismiss [Docket No. 30], Ex. E.)

[12]     Schuler's co-complainant in this suit, Plaintiff C. Westbrook Murphy, cross filed a charge with the EEOC and DCOHR on March 14, 2001. *See Murphy v. PricewaterhouseCoopers, LLP*, 357 F. Supp. 2d 230, 236 (D.D.C. 2004).

[13]     Schuler's December 12, 2001 charge was also attached as an exhibit to PwC's August 16, 2002 motion to dismiss.  (*See* Def.'s Mot. to Dismiss [Docket No. 30], Ex. G.)

action on May 20, 2002, alleging violations of the ADEA, DCHRA, and the Human

Rights Law of New York ("NYHRL"), Executive Law Article 15, *et seq*.  (Compl. ¶¶ 42-

51.)  Specifically, Schuler alleges that PwC denied him promotion to partnership in 1999,

2000, and 2001 and instead promoted younger, less experienced employees.  (Compl. ¶

29.)  Schuler sought to proceed on a "pattern or practice" theory on behalf of a class of

purportedly similarly situated "older" employees of the firm.[14]  (*See* Compl.)

On September 27, 2004, I issued a ruling on cross-motions for partial summary

judgment and defendant's motion to dismiss, significantly narrowing plaintiff's claims.

*Murphy v. PricewaterhouseCoopers, LLP*, 357 F. Supp. 2d 230 (D.D.C. 2004).  The

Court ruled that the case could not proceed as a class or collective action or on a pattern

or practice theory.  *Id.* at 247 ("[I]n light of this Court's earlier finding that the plaintiffs

may not proceed with their class allegations because they failed to adequately allege such

claims at the administrative level, it additionally concludes that they are barred from

proving their discrimination claims under a 'pattern and practice' theory.")  The Court

also held that, *to the extent* plaintiffs' pattern and practice claim was based on a

"disparate impact" theory, it was not cognizable under the ADEA.[15]  *Id.*  The Court also

---

[14]     In February 2005, Schuler filed another charge with the EEOC alleging that PwC's promotion policy violates the ADEA and DCHRA.  (*See Schuler v. PricewaterhouseCoopers*, Civil Action No. 05-2355 (D.D.C.), Compl. [Docket No. 1].)  When the EEOC dismissed Schuler's charge, he filed suit in the U.S. District Court for the District of Columbia.  (*Id.*)  In a previous decision, this Court construed Schuler's complaint to allege only discrete non-promotion claims and dismissed Schuler's claims for failure to exhaust administrative remedies.  *Schuler v. PricewaterhouseCoopers, LLP*, 457 F. Supp. 2d 1, 4 (D.D.C. 2006).  The D.C. Circuit reversed, finding that Schuler alleged pattern or practice class claims, which were timely filed.  *Schuler v. PricewaterhouseCoopers, LLP*, 514 F.3d 1365, 1371 (D.C. Cir. 2008).

[15]     Although the Supreme Court has since recognized the availability of a narrow disparate impact theory of liability under the ADEA, *see Smith v. City of Jackson*, 544 U.S. 228 (2005), Schuler has not

dismissed the following claims: (1) Schuler's claims against 20 of the 21 individual defendants;[16] (2) Schuler's claims against PwC's Board of Partners and Principals; (3) Schuler's ADEA retaliation claims; (4) Schuler's ADEA claims for non-promotion in the 1999 and 2000 cycles; and (5) Schuler's NYHRL claims.[17]   *Id.* at 238-40, 241-45.   As a result of this decision, the only claims remaining in this action are Schuler's disparate

---

moved to reinstate a disparate impact claim, nor has he alleged a cognizable disparate impact claim under *Smith*.

Even if he had alleged such a claim in this proceeding, as a matter of law, Schuler's complaint cannot be read to advance a claim under the disparate impact theory of liability.   In *Smith*, the Court defined disparate impact claims as those "involv[ing] *employment practices* that are *facially neutral* in their treatment of different groups but that in fact fall more harshly on one group than another."   *Smith*, 544 U.S. at 239 (quoting *Teamsters v. United States*, 431 U.S. 324, 335-36, n.15 (1977) (emphasis added)).   In this case, Schuler does not challenge a facially neutral employment practice and therefore cannot advance his claims under a disparate impact theory of liability.   *See Smith*, 544 U.S. at 239 (emphasizing that the prohibited activity in disparate impact cases be based on *non-age* factors).   The only allegedly discriminatory policy plaintiff identifies is the mandatory retirement provision in the Partnership Agreement.   This provision, however, is not neutral – on its face, it treats individuals differently based on their age.   Moreover, it is not an "employment practice" applicable to Schuler – the Partnership Agreement is an agreement among PwC's partners that has no application to employees such as Schuler.   *See Murphy*, 357 F. Supp. 2d at 249.   Accordingly, Schuler has not advanced a claim under the disparate treatment theory as articulated in *Smith* and any such claims will not be reinstated.

Even assuming, *arguendo*, that Schuler could advance such a claim, plaintiff has failed to establish a *prima facie* case of disparate impact because he has made no showing that there is any causal link between the mandatory retirement provision and any age disparities in the composition or admission rates of the PwC partnership.   *See Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 658 (1989).

[16]   The remaining individual defendant, Robert Morris, was voluntarily dismissed by the parties on January 28, 2008.   (*See* Docket No. 192.)

[17]   In previously dismissing Schuler's NYHRL claims, the Court held that "for a non-resident to assert a claim under [the New York Human Rights Law (NYHRL)], he must allege that the actual impact of the discriminatory act was felt in New York."   *Murphy*, 357 F. Supp. 2d at 244.   Since this ruling, the D.C. Circuit has determined that "no New York authority . . . suggest[s] that the impact of a discriminatory act must be felt within New York for the NYHRL to apply."   *Schuler*, 514 F.3d at 1379 (quotations and citations omitted).   Rather, the controlling New York state case, *Iwankow v. Mobil Corp.*, 150 A.D.2d 272 (App. Div. 1989), "merely requires [plaintiffs] to allege an in-state discriminatory act."   *Id.* at 1378.   Schuler has not moved to reinstate his NYHRL claim and, even given D.C. Circuit's interpretation of New York law, Schuler is not entitled to reinstatement of his dismissed NYHRL claims.   Plaintiff has presented no evidence supporting his contention that an act of discrimination occurred in New York.   Plaintiff merely assumes that having headquarters in New York implies that "policies and practices for PWC partnership admission" were made in New York.   (Pl.'s Opp'n at 12, citing Compl. ¶ 4).   Having presented no proof that a discriminatory act *actually* occurred in New York, the Court will not reinstate Schuler's NYHRL claims.

treatment claims under the ADEA for the 2001 cycle and Schuler's disparate treatment claims under DCHRA, pursuant to the Court's supplemental jurisdiction.[18]

Defendant PwC now moves for summary judgment on Schuler's remaining disparate treatment claims.  PwC argues that Schuler's remaining claims are time-barred and, to the extent these claims are not time-barred, Schuler has not produced sufficient evidence for a reasonable jury to find that PwC intentionally discriminated against Schuler on the basis of his age.  For the following reasons, the Court will grant defendant's motion for summary judgment.

### LEGAL STANDARD

Under Rule 56, summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the Court draws all reasonable inferences regarding the assertions made in a light favorable to the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The party opposing a motion for summary judgment, however, "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that

---

[18]     In precluding both parties' cross-motions for summary judgment on these claims, the Court found "the record is, as of yet, not fully developed regarding the particular circumstances under which the two plaintiffs were not advanced to partnership" and as a result there were genuine issues of material fact relating to the "disparate treatment" theory. *Murphy*, 357 F. Supp. 2d at 249.  Fact discovery was then reopened by Order of the Magistrate Judge entered May 22, 2006, permitting inquiry into "the reasons for Schuler and Murphy's non-promotion to partnership" (Docket No. 143 at 6-7), which concluded in February 2007.

there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (internal quotations

omitted).  Moreover, "any factual assertion[s] in the movant's affidavits will be accepted

. . . as being true unless [the opposing party] submits his own affidavits or other

documentary evidence contradicting the assertion." *Neal v. Kelly*, 963 F.2d 453, 456

(D.C. Cir. 1992) (quoting *Lewis v. Faulkner*, 689 F.2d 100, 102 (7th Cir. 1982)).

## ANALYSIS

### I.  Timeliness of Schuler's Remaining Claims

PwC moves for the dismissal of Schuler's remaining claims as untimely under the

ADEA and DCHRA.  The ADEA requires, as an administrative prerequisite for

commencing a civil action for a violation of the statute, that a plaintiff file an

administrative charge with the EEOC or with a deferral State agency (in this case,

DCOHR) "within 300 days after the alleged unlawful practice occurred."  29 U.S.C. §

626(d)(2).  Similarly, under DCHRA, a private cause of action must be filed "within one

year of the unlawful discriminatory act, or the discovery thereof."[19]  D.C. Code § 2-

1403.16.

Application of the statute of limitations for claims of disparate treatment, disparate

impact, and retaliation is governed by the Supreme Court's decision in *Nat'l R.R.

Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).  In *Morgan*, the Supreme Court held

that "*[e]ach incident of discrimination* . . . constitutes a separate actionable 'unlawful

---

[19]     The D.C. Court of Appeals has strictly construed this one year statute of limitations period: "The [DCHRA] provides specific timetables . . . for filing a claim of discrimination: within one year of the alleged unlawful discriminatory practice or its discovery . . . a complainant, seeking damages or other appropriate relief, may file a complaint either with [the Office of Human Rights] . . . or in any court of competent jurisdiction." *Brown v. Capitol Hill Club*, 425 A.2d 1309, 1311 (D.C. 1981).

employment practice'" for which an administrative charge must be filed. *Morgan*, 536

U.S. at 114 (emphasis added); *see also Ledbetter v. Goodyear*, 127 S.Ct. 2162, 2169

(2007).  To determine the point at which the limitations period begins to run in

employment discrimination cases, "the proper focus is upon the time of the

*discriminatory acts*, not upon the time at which the *consequences* of the acts became

most painful." *Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980) (quotations

and citations omitted); *see also Brown v. National Academy of Sciences*, 844 A.2d 1113,

1118 (D.C. 2004) (applying the *Ricks* limitations analysis to DCHRA claims); *Powell v.*

*Am. Red Cross*, 518 F. Supp. 2d 24, 32 (D.D.C. 2007) (same).

Accordingly, the Court must dismiss Schuler's ADEA claims to the extent that

they rely on alleged conduct occurring more than 300 days prior to the filing of his

administrative complaint and must dismiss Schuler's DCHRA claims to the extent that

they rely on alleged conduct occurring more than one year prior to the filing of his

administrative complaint.

### A.  1999 and 2000 Partner Admission Cycles

The Court previously dismissed as untimely Schuler's ADEA disparate treatment

claims for the 1999 and 2000 partner admission cycles; this decision need not be revisited

here.[20]  *See Murphy*, 357 F. Supp. 2d at 238-40.  Schuler's DCHRA claims for the 1999

---

[20]     Instead of focusing on the relevant issue – that is, whether plaintiff's remaining claims are based
on discriminatory conduct occurring within the applicable filing period – Schuler tries unsuccessfully to
revive his previously dismissed claims.

First, Schuler seeks to rely on his 2005 EEOC charge (which is the basis of a separate suit), as
recently construed by the D.C. Circuit, to support the timeliness of his claims in this action.  (*See* Pl.'s
Opp'n at 10 (citing *Schuler*, 514 F.3d 1365).)  In *Schuler*, the D.C. Circuit determined that Schuler's 2005
EEOC charge properly alleged a class-action pattern or practice claim.  *Schuler*, 514 F.3d at 1370-71.  As

and 2000 cycles must also be dismissed because they rely on discriminatory acts

occurring more than one year before the filing of Schuler's initial administrative

complaint.

Based on the undisputed facts in this case, the alleged discriminatory act for the

1999 cycle occurred – at the very latest – on July 1, 1999, the admissions date for new

partners. (*See* Def.'s Stmt. ¶ 4.) Schuler's DCHRA claim for this cycle consequently

expired on July 1, 2000, almost a year *before* Schuler filed his claim. Accordingly,

Schuler's 1999 DCHRA claim is dismissed.

Similarly, Schuler's DCHRA claim for the July 1, 2000 admission cycle must be

---

such, the D.C. Circuit held that Schuler's February 2005 charge was timely filed. *Id.* at 1379-80. In contrast, Schuler's 2001 EEOC charge, on which *this* case is based, did not allege any class claims. *See Murphy*, 357 F. Supp. 2d at 240-41. Schuler's 2001 EEOC charge was correctly construed to allege discrete claims of non-promotion because the administrative complaint "focus[ed] solely on [his] individual circumstances and [sought] relief for [his] personal claims" and "failed to adequately allege [class action] claims at the administrative level." *Murphy*, 357 F. Supp. 2d at 241, 247. Schuler's class allegations were thus dismissed and plaintiff was "barred from proving [his] discrimination claims under a 'pattern and practice' theory." *Id.* at 247. Accordingly, there are no pattern and practice class claims in this suit and the D.C. Circuit's construction of Schuler's 2005 charge is irrelevant to the timeliness of Schuler's 2001 charge and complaint. Each of Schuler's claims, as construed by this Court to allege discrete acts of discrimination, must therefore be supported by a timely filed charge. *See Morgan*, 536 U.S. at 113.

Second, Schuler also attempts to revive his 1999 and 2000 ADEA claims by "piggybacking" on Murphy's March 14, 2001 EEOC charge. (Pl.'s Opp'n at 11-12.) "The single-file [piggybacking] rule allows an individual plaintiff, *who has not filed an EEOC charge*, to satisfy the administrative exhaustion requirements under Title VII by relying on a charge filed by another plaintiff." *Campbell v. National R.R. Passenger Corp.*, 163 F. Supp. 2d 19, 25 (D.D.C. 2001) (emphasis added). Schuler may not invoke the single-file rule. As an initial matter, because Schuler did not raise this argument in opposition to PwC's first motion for summary judgment (when his 1999 and 2000 ADEA claims were dismissed), the Court may treat these arguments as conceded. *See FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997). Additionally, even if Schuler were not barred from raising this argument, he cannot invoke the single-file rule. A claimant may not rely on another individual's perfected charge if he or she has previously filed a charge related to the litigation. *Campbell*, 163 F. Supp. 2d at 25; *see also Gilitz v. Compagnie Nationale Air France*, 129 F.3d 554, 558 (11th Cir. 1997); *Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 564-65 (2d Cir. 2006); *Anderson v. Unisys Corp.*, 47 F.3d 302, 309 (8th Cir. 1995); *Mooney v. Aramco Servs. Col.*, 54 F.3d 1207, 1223-24 (5th Cir. 1995). Because Schuler filed his own administrative charge, he may not rely on Murphy's charge in an attempt to revive his untimely claims.

dismissed.  Under the standard set forth above, the statute of limitations begins to run under DCHRA when the "plaintiff is given unequivocal notice of the [adverse] decision," not on the effective date of the decision.  *Powell*, 518 F. Supp. 2d at 32; *see also Ricks*, 449 U.S. at 258 (The "discrimination occur[s] – and the filing limitations period[] . . . commence[s] – at the time the [promotion] decision was made and communicated to [the plaintiff].  That is so even though one of the *effects* of the [decision] . . . did not occur until later."); *Stephenson v. Am. Dental Ass'n*, 789 A.2d 1248, 1251-52 (D.C. 2002).  The undisputed facts show that Schuler knew he would not be promoted during the 2000 cycle *before* June 2, 2000, the formal firm-wide announcement of new partner admissions.  (Def.'s Ex. H.)  Schuler himself testified that the list of newly admitted partners was known prior to the formal announcement on June 2, 2000 and that he had personally learned about Albright's promotion from a co-worker in late May.  (Def.'s Mot. Summ. J., Schuler 2/7/2007 Tr. at 164-69.)  The DCHRA limitations period thus began to run when the alleged discriminatory act was communicated to Schuler – that is, in late May 2000.  Because the limitations period expired several weeks before Schuler filed his initial charge on June 29, 2001, Schuler's 2000 DCHRA claim must also be dismissed.

### B.  2001 Partner Admission Cycle

PwC also contends that Schuler's disparate treatment claims for the July 1, 2001 cycle should be dismissed.  PwC theorizes that – since Schuler's chances of making partner in 2001 were essentially foreclosed by Albright's admission in 2000 – the only relevant discriminatory act here is Albright's 2000 admission.  Accordingly, Schuler's

non-admission in 2001 was simply a delayed consequence of Albright's earlier admission.[21] (Def.'s Mot. Summ. J. at 18-24.)  As such, PwC argues that Schuler's disparate treatment claim for the 2001 cycle began to accrue in late May 2000 – when Schuler learned about Albright's admission – and is thus time-barred. (*Id.*)  The Court disagrees.

Defendant's attempt to characterize Schuler's 2000 and 2001 non-promotions as one discriminatory act is unavailing.  Schuler has alleged three discrete failures to promote – in 1999, 2000, and 2001 (Compl. ¶ 29) – each of which must be supported by a timely filed administrative complaint. *See Ricks*, 449 U.S. 250.  PwC has not shown that Schuler's non-promotion in 2001 was an "inevitable consequence" of Albright's promotion in 2000 or that Schuler had "unequivocal notice" of his non-promotion in 2001 before the expiration of the applicable limitations period. *See Ledbetter*, 127 S.Ct. 2162 (receiving lower paychecks as a result of earlier discriminatory evaluations was not a separate discriminatory act that could trigger a new EEOC charging period); *Thompson v. Capitol Police Bd.*, 120 F. Supp. 2d 78 (D.D.C. 2000) (plaintiff's ineligibility to sit for Lieutenant's exam was inevitable consequence of plaintiff's termination; it was not a separate act made with discriminatory intent and therefore did not trigger new EEOC charging period); *Jarmon v. Powell*, 208 F. Supp. 2d 21 (D.D.C. 2002) (plaintiff's

---

[21]    In support of this theory, PwC cites to Schuler's deposition testimony in which he stated that he believed his chances of making partner after the admission of Albright were limited due to the small size of the RAS unit. (*See* Schuler Tr. at 53, 88.)  This, however, does not establish that Schuler had "unequivocal notice" of his non-promotion in 2001 at the time Albright was promoted in 2000. Indeed, Schuler testified that he believed that he was qualified to be partner and would have made partner in 2001 if he had been supported. (*Id.* at 306-07.)

ineligibility for promotion to GS-15 level was an "inevitable consequence" of his earlier non-promotion to GS-14 level and therefore did not trigger new EEOC charging period). Accordingly, the Court will not dismiss Schuler's disparate treatment claims for the 2001 promotion cycle.

## II. Plaintiff's Remaining Disparate Treatment Claims

### A. Governing Law

Under a "disparate treatment" theory of liability of age discrimination, a plaintiff must demonstrate that his employer intentionally treated him less favorably *because of* his age.[22] *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609-10 (1993). Where direct evidence of discriminatory intent is not available, courts have traditionally applied the familiar burden-shifting scheme first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973): (1) the plaintiff has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination; (2) the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its actions; and (3) the plaintiff must then prove by a preponderance of the evidence that the employer's stated reasons were in reality a pretext for discrimination.[23] *See Stella v.*

---

[22]     In applying the provisions of the ADEA and DCHRA, courts in this district have drawn on Supreme Court precedent regarding race and gender discrimination under Title VII of the Civil Rights Act of 1964. *See Carpenter v. Fed. Nat'l Mortg. Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999); *Arnold v. U.S. Postal Service*, 863 F.2d 994, 996 (D.C. Cir. 1988); *Mianegaz v. Hyatt Corp.*, 319 F. Supp. 2d 13, 18 (D.D.C. 2004); *see also Futrell v. Dep't of Labor Federal Credit Union*, 816 A.2d 793, 802 (D.C. 2003). Courts thus apply the *McDonnell Douglas* burden-shifting framework developed in the context of Title VII claims in evaluating age discrimination claims at the summary judgment phase. *Mianegaz*, 319 F. Supp. 2d at 18 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)). Because the Court applies the same analysis to Schuler's ADEA and DCHRA claims, the Court refers from this point on to Schuler's claims under the ADEA only.

[23]     Plaintiff seeks to proceed both under the traditional pretext analysis and under a mixed-motive

*Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002) (citing, among other authorities, *McDonnell Douglas*, 411 U.S. at 802-04).

The D.C. Circuit has recently clarified the *McDonnell Douglas* analysis "where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision."[24] *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  In such cases, a court need not – and should not – determine whether the plaintiff has produced sufficient evidence to support an inference of discrimination.  *Id.*  Instead, it should proceed directly to the third step of the *McDonnell Douglas* framework and determine whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin."  *Id.* (citations omitted).

### B. *Initial Inquiry Under* Brady

Before deciding the ultimate issue under *Brady*, the Court must first find that plaintiff has alleged an adverse employment action and that defendant has proffered a legitimate, non-discriminatory rationale for the alleged discriminatory action.  In this

---

analysis. (*See* Pl.'s Opp'n at 14.)  Because Schuler has not shown that age was a factor, let alone a "substantial motivating factor," in PwC's non-promotions decisions, there is no basis upon which Schuler may proceed on a "mixed motive" theory.  *See Thomas v. Nat'l Football League Players Ass'n*, 131 F.3d 198, 202 (D.C. Cir. 1997) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 276 (1989)).

[24]     Although *Brady* was decided in the context of a Title VII race claim, the analysis is also applicable to ADEA disparate treatment claims.  *See, e.g., Beard v. Preston*, 2008 WL 4273122, at *6 (D.D.C. Sept. 18, 2008) (applying *Brady* to an ADEA claim); *Brantley v. Kempthorne*, 2008 WL 2073913, at *3 (D.D.C. May 13, 2008) (same); *Short v. Chertoff*, 555 F. Supp. 2d 166, 172 (D.D.C. 2008) (same).

case, Schuler has alleged an adverse employment action – his denial to the partnership in

the 2001 admission cycle. *See Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)

(defining an adverse employment action as "a significant change in employment status,

such as hiring, firing, *failing to promote*, reassignment with significantly different

responsibilities, or a decision causing significant change in benefits") (internal citations

omitted, emphasis added).   Additionally, PwC has asserted several non-discriminatory

explanations for Schuler's non-promotion.   First, PwC alleges that there was no business

case for another RAS unit partner in 2001.   Given the small size of the RAS unit and the

admission of Albright in 2000, there was simply no room for an additional partner in

2001.  (Def.'s Stmt. ¶ 15.)  As a result, no RAS employee was sponsored or admitted as a

partner in that cycle and no new partners were admitted from RAS until the 2004 cycle,

when RAS employee Jeffrey Lavine was admitted.  (*Id.* ¶ 16.)  Second, even if there had

been a business need for another RAS partner in 2001, Schuler had become a "2" rated

performer in 2000 and thus no longer met the minimum qualifications to become a

potential partner candidate.[25]  (*Id.* ¶ 17 (citing Bench Tr. at 125; Schuler 2/7/2007 Tr. at

156, 175).)

### C. Pretext Inquiry

Under *Brady*, the Court must determine if plaintiff has "produced sufficient

evidence for a reasonable jury to find that the employer's asserted non-discriminatory

reason was not the actual reason and that the employer intentionally discriminated against

---

[25]     Schuler viewed these ratings as "devastating" to his chances of being admitted to partner.
(Schuler 2/7/07 Tr. at 177-78.)

the employee." *Brady*, 520 F.3d at 494.  In making this determination on pretext, a court

must consider whether the jury could infer discrimination from (1) the plaintiff's *prima*

*facie* case, (2) any evidence the plaintiff presents to attack the employer's proffered

explanation, and (3) any further evidence of discrimination that may be available to the

plaintiff.  *Waterhouse v. District of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002)

(quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998)).  "The plaintiff

need not present evidence in each of these categories in order to avoid summary

judgment.  Rather, the court should assess the plaintiff's challenge to the employer's

explanation in light of the total circumstances of the case."  *Short v. Chertoff*, 555 F.

Supp. 2d 166, 172 (D.D.C. 2008) (citations omitted).

   In this case, Schuler has presented no evidence to directly rebut PwC's two stated

non-discriminatory explanations for Schuler's non-promotion.[26]  (*See* Pl.'s Stmt. [Docket

No. 200-3].)  Plaintiff instead relies principally on two sources of evidence – *i.e.*, the

partner retirement provision and statistical reports – to prove that PwC acted with

discriminatory intent.[27]  Plaintiff, however, has failed to rebut PwC's legitimate, non-

---

[26]    First, Schuler does not challenge PwC's explanation that no one – including Schuler – was
promoted from the RAS unit in 2001 because there was simply no business need for an additional partner.
Second, Schuler provides no evidence to rebut PwC's explanation that he was no longer qualified for
partner in 2001.  Schuler baldly asserts, without providing *any* evidentiary support, that his diminished
performance ratings were in retaliation for Schuler challenging PwC's discriminatory policies.  (Pl.'s
Opp'n at 23.)  These allegations are wholly unsupported and do not raise any genuine issues of material
fact.

   Moreover, plaintiff's 7(h) Statement primarily raises questions of law and does not contradict any
material statement of fact asserted by the defendant.  (*See* Pl.'s Stmt.)

[27]    It is worth noting that Schuler has at best made out only a weak *prima facie* case of
discrimination for the 2001 cycle.  A plaintiff makes out a *prima facie* case of disparate-treatment
discrimination "by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse
employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  *George*

discriminatory explanations and has not presented sufficient evidence to support a finding

by a reasonable jury of intentional discrimination based on age.  *See Holcomb v. Powell*,

433 F.3d 889, 901 (D.C. Cir. 2006).  How so?

### *i. Partner Retirement Provision*

Schuler asserts that "PwC has a written policy barring candidates over 60 from

consideration for promotion to the partner job" and that such policy is "discriminatory on

its face" and constitutes "direct evidence" of discrimination against Schuler.  (Pl.'s Opp'n

at 13-14.)  Plaintiff, however, has pointed to no "written policy" barring candidates over

60 from *consideration* for promotion to partner but instead relies heavily on the

retirement provision in the Partnership Agreement as proof that PwC has such a policy.

(*Id.* at 14.)  This reliance, however, is misplaced.  The Partnership Agreement is not a

policy barring older candidates from partnership, but instead is an agreement among the

partners at PwC, requiring all individuals subject to the agreement to retire in the fiscal

year in which they turn 60.  (Pl.'s Ex. 1.)  It is binding only on the partners and principals

of the firm and no similar retirement provisions exist for employees.[28]  (*Id.*; Def.'s Stmt.

---

v. *Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (citing *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002)) (internal quotations and citations omitted).  "One method by which a plaintiff can satisfy the third prong of this test is by demonstrating that she was treated differently from similarly situated employees who are not part of the protected class." *Id.* (citing *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999)).  While Schuler is a member of a protected class (he was over the age of 40 at the time of the alleged discriminatory action) and he suffered an adverse employment action (non-promotion), Schuler has not presented evidence that a similarly situated younger employee was promoted during the 2001 cycle.  *See Beeck v. Federal Express Corp.*, 81 F. Supp. 2d 48, 54 (D.D.C. 2000).

[28]     Contrary to plaintiff's suggestion, whether a partner at PwC could theoretically invoke the ADEA's protection under the framework set out in *Clackamas Gastroenterology Associates, P.C. v. Wells*, 538 U.S. 440, 444 (2003), is not relevant to the ultimate issue presented here – that is, whether PwC intentionally discriminated against Schuler on the basis of his age – and is therefore outside the scope of this opinion.

¶ 19.) As the Court previously noted, because the Partnership Agreement "neither

addresses nor binds the plaintiffs in any way," it "cannot form the sole basis of a

'disparate treatment' theory."[29] *Murphy*, 357 F. Supp. 2d at 249.  Moreover, plaintiff has

provided no additional evidence of an age-related policy in connection with the partner

admissions process.[30]

### *ii. Statistical Proof*

In an effort to bolster his claim of discriminatory intent, plaintiff offers statistical

evidence as proof of pretext.[31]  (Pl.'s Opp'n at 15-17.)  Plaintiff relies on a report

prepared by Lance Seberhagen, a statistician and Industrial Psychologist. (*Id.* at 4.)  Dr.

---

[29]     Now that the record has been fully developed, Schuler's continued reliance on the Partnership Agreement as evidence of discriminatory intent is insufficient without more to carry his burden of proof.

[30]     As additional proof of PwC's discriminatory policy, Schuler points to a stray comment made by Tim Ryan (managing partner of the Banking Practice group) about PwC's desire to have their partners serve for 20 or more years. (Pl.'s Ex. 2.)  This comment, however, does not support a finding of pretext or discriminatory intent.  First, Schuler provides no support to show that Ryan's statement was a "policy" held by PwC.  Moreover, the comment is documented only by a one-page memorandum prepared by Plaintiff Murphy and seems to be taken out of context. (Def.'s Reply, Ryan Tr. at 176 (Ryan testified that the comment was made during the course of a four-hour morale boosting session and that he "made the comment from a selfish standpoint" – "we want to have you folks around, and we don't want you to leave this place.").)  Stray comments, such as this one, "by persons not involved in the employment decision-making process are not material to a finding of discrimination unless those remarks are made to the decision-makers and have some impact on the selection process." *Garrett v. Lujan*, 799 F. Supp. 198, 200 (D.D.C. 1992); *see also Threadgill v. Spellings*, 377 F. Supp. 2d 158, 160 (D.D.C. 2005).  Schuler has provided no evidence to show that Ryan, who did not become managing partner of the Banking Practice group until after the announcement of new partners for the July 1, 2001 admission cycle, had any involvement in the decision-making process for Schuler's partnership prospects. (*See* Ryan Tr. at 166-67.)  Consequently, this comment cannot support an inference of intentional age discrimination.

[31]     In determining whether an employee has been the subject of discrimination, "the courts have consistently emphasized that the ultimate issue is the reasons for *the individual plaintiff's* treatment, not the relative treatment of different *groups* within the workplace." *Horvath v. Thompson*, 329 F. Supp. 2d 1, 10 (D.D.C. 2004) (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).  However, statistical evidence may be relevant in disparate treatment actions such as this one. *See McDonnell Douglas*, 411 U.S. at 804-05; *see also Krodel v. Young*, 748 F.2d 701, 710 (D.C. Cir. 1984) (Such evidence is "admissible and may be helpful, though ordinarily not dispositive.").  The usefulness of statistics "depends on all the surrounding facts and circumstances." *Krodel*, 748 F.2d at 710; *see also Bell v. Envtl. Protection Agency*, 232 F.3d 546, 553 (7th Cir. 2000) ("Statistical evidence is only one small part of a substantial web of evidence indicating pretext.").

Seberhagen undertook a comparative analysis of the aggregate number of promotions at PwC from 1998 to 2005. (Pl.'s Opp'n, Seberhagen Decl. ¶ 2.) Dr. Seberhagen compared the number of those individuals who made partner ("passed") to those who did not, within age cohorts. (*Id.*, Tables 2, 3.) For example, Dr. Seberhagen found that individuals under 40 had a "pass" rate of 50.9% while those over 40 had a "pass" rate of 16.3%.[32] (*Id.*, Table 2.) PwC challenges Schuler's statistical analysis as fundamentally flawed and lacking in probative value. (Def.'s Reply at 16-21.) The Court agrees with PwC's criticisms and finds that Schuler has failed to show how the proffered statistics support an inference of intentional discrimination.

To come up with his promotion rates, Dr. Seberhagen compared the number of individuals who made partner (a known number) to the "pool" of partnership candidates (a number not known by Dr. Seberhagen). (Seberhagen Decl.) Dr. Seberhagen made *no* effort to ensure that the pool of partnership candidates that provided the basis for his analysis were actually those employees who were qualified, interested, or eligible to make partner. Instead, he used the total number of directors and managing directors from across PwC as the pool of partnership candidates, simply *assuming* that *all* of these individuals were interested in the partnership position, qualified for the position, and equally likely to be selected as a candidate for a partnership position. (*See* Def.'s Reply, Seberhagen Tr. at 133-34, 143-44.) Because of this, it is impossible to tell whether the higher promotion rates for younger employees were due to age or some other non-

---

[32] Dr. Seberhagen found similar results when comparing the "pass" rates for those individuals under and over 45. (*See id.*, Table 3.)

discriminatory explanation (such as lack of qualifications or lack of interest). *Horvath*, 329 F. Supp. 2d at 11 ("comparisons must be made among comparable individuals") (quoting *Farrokhi v. Laura Ashley, Inc.*, 82 F. Supp. 2d 1248, 1253 (D.N.M. 1999). As a result, Dr. Seberhagen's statistics simply do not "accurately reflect the gravamen of the plaintiffs' case" and are insufficient to permit a jury to find that PwC's proffered non-discriminatory reason was pretextual. *Frazier v. Consolidated Rail Corp.*, 851 F.2d 1447, 1453 (D.C. Cir. 1988) (statistics were not reliable as evidence of discrimination because they made no distinction between employees in general and those eligible for promotion).

Considering the entire record, the strength of Schuler's *prima facie* case, the strength of PwC's legitimate, non-discriminatory rationale, and the evidence relating to pretext, the Court finds that a reasonable jury could not conclude from all of the evidence that Schuler's non-promotion in 2001 was made for a discriminatory reason. Schuler has not provided evidence sufficient to rebut PwC's legitimate, non-discriminatory explanations for his non-promotion and has not met his burden in proving intentional discrimination.

## CONCLUSION

Thus, for all of the foregoing reasons, the Court GRANTS defendant's Motion for

Summary Judgment.  An appropriate Order consistent with this ruling accompanies this

Opinion.

RICHARD J. LEON
United States District Judge